IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CMA CGM, S.A., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-25-1320 |
| | § | |
| GCC SUPPLY & TRADING L.L.C., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, CMA CGM, S.A., ("CMA" or "Plaintiff"), brings this action against Defendant, GCC Supply & Trading L.L.C. ("GCC" or "Defendant") for breach of contract, breach of warranties, negligence, and product liability arising from the delivery of contaminated bunker fuels to CMA vessels.[1]  Pending before the court is GCC Supply & Trading LLC's Motion to Compel Arbitration and Dismiss this action or Alternatively Stay These Proceedings ("Defendant's Motion to Compel") (Docket Entry No. 11).  Also before the court are Plaintiff's Response Opposing Defendant's Motion to Compel Arbitration and Dismiss ("Plaintiff's Response in Opposition") (Docket Entry No. 13), and GCC Supply & Trading LLC's Reply to CMA CGM, S.A.'s Opposition to Motion to Compel Arbitration and Dismiss This Action Or Alternatively Stay These Proceedings ("Defendant's Reply") (Docket Entry No. 18).  For the reasons stated below, Defendant's Motion to Compel will be granted and this action will be stayed pending completion of the arbitration.

---

[1]See Complaint, Docket Entry No. 1, pp. 3-6 ¶¶ 14-39.  Page numbers for docket entries refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

1

## I. **Background**

### A.   **Plaintiff's Factual Allegations**[2]

CMA alleges that it is a French shipowner and charterer and that Defendant is a manufacturer, seller, and supplier of marine fuel. CMA alleges that between March and June of 2023, GCC sold and delivered approximately 33,628 Metric Tons of very low sulfur fuel oil to CMA, and that shortly thereafter, its vessels encountered significant operational issues. CMA alleges that it put GCC on notice of these issues as soon as they became known. CMA alleges that GCC either had actual knowledge, or should have known, that the marine fuel it manufactured and sold between March and June of 2023 was unfit and would cause harm if consumed by vessels, but failed to notify CMA of the known defects of its product.

### B.   **The Parties' Undisputed Course of Dealing**[3]

From January of 2022 to early June of 2023 Frank Ray ("Ray") of GCC and Sandra Galliano ("Galliano") of CMA exchanged emails reflecting the parties' negotiation and agreement that CMA's purchase of marine fuel from GCC for vessels that CMA owned or operated would be governed by standardized contractual terms for the purchase and supply of marine fuels developed by the Baltic and

---

[2]Id. at 2-3 ¶¶ 8-13.

[3]See Defendant's Motion to Compel, Docket Entry No. 11, pp. 7-12; and Plaintiff's Response in Opposition, Docket Entry No. 13, pp. 5-7, 11-14.

International Maritime Council ("BIMCO").[4]  On January 3, 2022, Ray wrote "[t]here are only 3 remaining open items which are things GCC needs to consider the Bimco terms.  We have signed off on pretty much everything else . . . The remaining 3 things are very very important to us[:] (de Bunkering, liability, and arbitration)."[5] On January 6, 2022, Galliano responded, "Noted and passing to legal team for internal discussions."[6]  On October 13, 2022, Galliano sent Ray an email attached to which was "the latest CMA mark-up for GTCs/BIMCO matter."[7]  In the body of the email, Galliano stated

> [h]ope that version will be accepted [by] your side so
> that we can close that file and continue business
> together on that basis.  As indicated in our last tender
> agreement "+Mutual terms agreed between our 2 companies
> to be applied — new agreement to come if any to be taken
> into account."[8]

On December 10, 2022, CMA sent GCC Contract Confirmation 4071, pursuant to which CMA agreed to purchase and GCC agreed to deliver

---

[4]See Email Chain from January 3, 2022 to March 8, 2023, Exhibit C to Defendant's Motion to Compel ("Email Chain"), Docket Entry No. 11-4; Email Chain from January 3, 2022 to June 2, 2023 ("Email Chain"), Exhibit D to Defendant's Motion to Compel, Docket Entry No. 11-5.

[5]Id., Docket Entry No. 11-4, p. 13; Docket Entry No. 11-5, p. 16.

[6]Id., Docket Entry No. 11-4, p. 12; Docket Entry No. 11-5, p. 15.

[7]Id., Docket Entry No. 11-4, p. 12; Docket Entry No. 11-5, p. 14.

[8]Id., Docket Entry No. 11-4, p. 12; Docket Entry No. 11-5, p. 14.

bunker fuels to CMA vessels in March of 2023. In addition to identifying the parties, payment terms, and warranties, Contract Confirmation 4071 stated: "**+GCC Last proposed Bimco adjusted terms/once a new agreement is in place it will apply.**"[9]

On January 4, 2023, Galliano wrote to Ray asking:

Any news please? Quite [a] long process this one, we are discussing since many months and would need to step forward. As you know, we have tender in place with you for Q1 2023 and as indicated below "+ Mutual terms agreed between our 2 companies to be applied — new agreement to come if any to be taken into account."[10]

On February 6, 2023, Galliano sent Ray an email with Letter Agreement that had the following choice of law and forum selection provisions in ¶ 6:

**GOVERNING LAW AND JURISDICTION**

1.    This letter and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of England & Wales.

2.    Each Party irrevocably agrees that the courts of England & Wales shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual

---

[9]Contract Confirmation 4071, Exhibit E to Defendant's Motion to Compel, Docket Entry No. 11-6, p. 2. Contract Confirmation 4071 also appears in the record as part of Exhibit D to Plaintiff's Response in Opposition, Docket Entry No. 13-4, pp. 2-4. See also Plaintiff's Response in Opposition, Docket Entry No. 13, pp. 11-12.

[10]Email Chain, Docket Entry No. 11-4, p. 11, Docket Entry No. 11-5, p. 14.

disputes or claims) arising out of or in connection with this letter or its subject matter or formation.[11]

On February 10, 2023, Ray sent Galliano an amended Letter Agreement seeking to replace the choice of law and forum selection provisions in ¶ 6 with the following arbitration provision: "**GOVERNING LAW AND JURISDICTION** — as set forth in the Bunker Terms 2018, U.S. General Maritime Law/New York law, New York SMA [Society of Maritime Arbitrators] arbitration."[12]

On March 8, 2023, Galliano responded to Ray: "Having reviewed this internally and point 6 amended is accepted on letter."[13]

On March 3, 10, 13, and 17, 2023, GCC sent CMA Sales Order Confirmations listing specific fuel deliveries to be made pursuant to Contract Confirmation 4071.  The March 3, 2023, Sales Order Confirmation called for delivery on March 16, 2023.[14]  That Sales Order Confirmation stated that

> [t]he sale and delivery of the marine fuels described above are subject to the GCC Supply & Trading, LLC's Terms and Conditions for the Sale of Marine Bunkers ["GCC Terms"].  The acceptance of the Bunkers by the vessel named above shall be deemed to constitute acceptance of

---

[11]Id., Docket Entry No. 11-4, p. 6, Docket Entry No. 11-5, p. 8.

[12]Id., Docket Entry No. 11-4, p. 3, Docket Entry No. 11-5, p. 6.

[13]Id., Docket Entry No. 11-4, p. 1, Docket Entry No. 11-5, p. 3.

[14]See March 3, 2023, Sales Order Confirmation included in Exhibit A to Plaintiff's Response in Opposition, Docket Entry No. 13-1, p. 2.

the said general terms applicable to you as "Buyer" and
to GCC Supply and Trading, LLC as "Seller".[15]

The March 10th Sales Order Confirmation called for delivery on
March 19, 2023,[16] the March 13, 2023, Sales Order Confirmation
called for delivery on March 19, 2023,[17] and the March 17, 2023,
Sales Order Confirmation called for delivery on March 25, 2023.[18]
Each Sales Order Confirmation stated that "[t]he sale and delivery
of the marine fuels described above are subject to the [GCC Terms]"
and that "[t]he acceptance of the Bunkers by the vessel named above
shall be deemed to constitute acceptance of the [GCC Terms]."[19]

    In pertinent part the GCC Terms included the following choice
of law and forum selection provisions:

    18.1 This Agreement and any suit, claim, dispute, or
         action arising out of or in connection with this
         Agreement shall be governed and construed in
         accordance with the General Maritime Law of the
         United States of America, and to the extent that
         such is inapplicable or may be supplemented, then
         the laws of the State of Texas, without reference
         to any conflict of laws rules. . .

                        . . .

    18.3 Without prejudice to any other Section herein, the
         Buyer and Seller agree that any suit, claim,

---

    [15]Id. at 3-4.

    [16]Id. at 5.

    [17]Id. at 8.

    [18]Id. at 11.

    [19]Id. at 6 (March 10, 2023); 9-10 (March 13, 2023); and 12-13
(March 17, 2023).

> dispute, controversy or action arising out of or in connection with this Agreement, . . . shall be litigated, if at all, in a federal court located in Harris County, Texas to the exclusion of the courts of any other country, state, county, or city. . .[20]

On March 23, 2023, CMA sent GCC three additional Contract Confirmations: 4192, 4194, and 4196.  These Contract Confirmations provided terms for delivery of bunkers in April, May, and June of 2023, respectively.   In addition to identifying the parties, payment terms, and warranties, Contract Confirmations 4192, 4194, and 4196 stated: "+Terms: the one we are currently finalizing would apply to this tender."[21]  In April, May, and June of 2023, GCC sent CMA Sales Order Confirmations listing specific fuel deliveries to be made pursuant to Contract Confirmations 4192, 4194, and 4196. Each Sales Order Confirmation stated that "[t]he sale and delivery of the marine fuels described above are subject to the [GCC Terms]" and that "[t]he acceptance of the Bunkers by the vessel named above shall be deemed to constitute acceptance of the [GCC Terms]."[22]

---

[20]GCC Supply & Trading LLC Terms and Conditions for the Sale of Marine Bunkers Edition 2021, Exhibit C to Plaintiff's Response in Opposition, Docket Entry No. 13-3, p. 21 ¶¶ 18.1 and 18.3.

[21]Plaintiff's Response in Opposition, Docket Entry No. 13, pp. 12-13 (quoting Contract Confirmations 4192, 4194, and 4196, Exhibits F, G, and H to Defendant's Motion to Compel, Docket Entry Nos. 11-7 (4192), p. 2, 11-8 (4194), p. 2, and 11-9 (4196), p. 2). See also Contract Confirmations 4192, 4194, and 4196 included in Exhibit D to Plaintiff's Response in Opposition, Docket Entry No. 13-4, pp. 5-7 (4192), 8-10 (4194) and 11-13 (4196).

[22]Id. at 6.  See also id. at 12-13 (referencing Sales Order Confirmations dated April 3, 5, 6, and 11, 2023, May 22, 2023, and (continued...)

On June 2, 2023, CMA sent GCC a "complete version" of the BIMCO Bunker Terms 2018 "as per discussions" along with a cover letter from "Farid Trad, VP Bunkering & Energy Transition, duly authorized for and on behalf of CMA CGM, S.A.," setting out the "legally binding agreement" between CMA and GCC and recapping the prevailing terms and conditions agreed between the parties, including the arbitration provision in ¶ 6 to which CMA agreed on March 8, 2023.[23]  In pertinent part the Letter Agreement states:

> Agreement about prevailing terms and conditions.
>
> This letter sets out the terms of a legally binding agreement between: [CMA and GCC]. . .
>
> . . .
>
> The Parties wish to record here their agreement that, from the date of this letter:
>
> a.   the terms and conditions attached in Annex 1 of this letter ("Bunker Terms 2018") shall apply to any contract for the sale of marine fuel by the Seller or the Seller's Affiliates to the Buyer or the Buyer's Affiliates ("Contract") and be the sole set of terms and conditions that apply to such Contract;
>
> b.   should any other set of terms and conditions appear on, or be referred to in, any of the Seller's or its Affiliates' confirmation notes or any other communications issued by the Seller or its Affiliates in relation to any marine fuel, which is sold by the Seller

---

[22] (...continued)
June 2, 6, and 8, 2023, Exhibit A to Plaintiff's Response in Opposition, Docket Entry No. 13-1, pp. 15-16, 18-19, 21-22, 24, 27-28, 31, 33-34, 36-37, 39-40); GCC Trade Confirmation, June 14, 2023, Exhibit O to Defendant's Motion to Compel, Docket Entry No. 11-16, pp. 2-3 (containing the same language).

[23] Letter Agreement, Docket Entry No. 11-2, pp. 1-2.

or its Affiliates to the Buyer or the Buyer's Affiliates,
then such set of terms and conditions shall not be
incorporated in any Contract; and

c.   if any term appears on, or is referred to in, any of
the Seller's or its Affiliates' confirmation notes or any
other communications issued by the Seller or its
Affiliates in relation to any Contract, which conflicts
with the Bunker Terms 2018, then the Bunker Terms 2018
shall prevail.[24]

Attached to the Letter Agreement as Annex 1 was the BIMCO
Bunker Terms 2018 as amended.[25]   In pertinent part the Dispute
Resolution Clause of the BIMCO Bunker Terms 2018 states:

The Contract shall be governed by US maritime law or, if
the Contract is not a maritime contract under US law, by
the laws of the State of New York.  Any dispute arising
out of or in connection with the Contract shall be
referred to three (3) persons at New York, one to be
appointed by each of the parties hereto, and the third by
the two so chosen.  . . . The proceedings shall be
conducted in accordance with the SMA Rules current as of
the date of the Contract.[26]

On June 28, 2023, Zac Stansbury digitally signed the Letter
Agreement on behalf of GCC.[27]


## II. <u>Applicable Law and Standard of Review</u>

CMA "asserts claims for maritime tort and breach of a maritime
contract arising from the manufacture, sale, and supply of marine

---

[24]<u>Id.</u> at 1 & ¶ 1.

[25]BIMCO Bunker Terms 2018 as amended, Docket Entry No. 11-2,
pp. 3-24.

[26]<u>Id.</u> at § 24(b), Docket Entry No. 11-2, p. 14.

[27]Letter Agreement, Docket Entry No. 11-2, p. 2.

fuel to [CMA] for consumption by the vessels owned or operated by [CMA]."[28]  Asserting that the parties' contract, i.e., the BIMCO Bunker Terms 2018, mandates that "[a]ny dispute arising out of or in connection with the Contract shall be referred to three (3) persons at New York [SMA Arbitration],"[29] and citing § 3 of the Federal Arbitration Act ("FAA"), GCC argues that "CMA must arbitrate its purported claims against GCC in New York SMA Arbitration if it wishes to continue pursuing the same."[30] Alternatively, GCC argues that

> to the extent CMA CGM takes the position that the BIMCO Bunker Terms 2018 do not apply to this dispute, which is denied, then the [GCC Terms] . . . . would apply to the marine fuel sales at issue, and while those terms would allow disputes arising from the purchase and sale of marine fuel to be litigated in this district, those terms also provide for a deadline of thirty (30) days for claims as to quality and overall legal proceeding deadline of twelve (12) months, such that CMA CGM's allegations and the above-captioned civil action are time barred and should be dismissed for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[31]

---

[28]Complaint, Docket Entry No. 1, p. 1.  See also id. at 3-6 ¶¶ 14-39 (asserting claims for breach of contract, breach of warranties, negligence, and product liability).

[29]Defendant's Motion to Compel, Docket Entry No. 11, p. 1.

[30]Id. at 2.

[31]Id.

**A.    The Federal Arbitration Act**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 <u>et seq.</u>, creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." <u>Moses H. Cone Memorial Hospital v. Mercury Construction Corp.</u>, 103 S. Ct. 927, 941 (1983) (citing <u>Prima Paint Corp. v. Flood & Conklin Manufacturing Corp.</u>, 87 S. Ct. 1801, 1805-06 (1967)).    Underlying the FAA is "the fundamental principle that arbitration is a matter of contract." <u>AT&T Mobility LLC v. Concepcion</u>, 131 S. Ct. 1740, 1745 (2011) (quoting <u>Rent-A-Center, West, Inc. v. Jackson</u>, 130 S. Ct. 2772, 2776 (2010)).    <u>See also Washington Mutual Finance Group, LLC v. Bailey</u>, 364 F.3d 260, 264 (5th Cir. 2004)("The purpose of the FAA is to give arbitration agreements the same force and effect as other contracts — no more and no less.").

Section 2 of the FAA states that

> [a] written provision in any maritime transaction or contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . .

9 U.S.C. § 2.

Section 3 of the FAA requires federal courts, on a party's motion, to stay litigation of claims subject to arbitration. 9 U.S.C. § 3. <u>See Smith v. Spizzirri</u>, 144 S. Ct. 1173, 1178 (2024).

Section 4 of the FAA permits a party aggrieved by the alleged failure or refusal of another to arbitrate under a written arbitration agreement to petition any United States district court which, save for such agreement, would have subject matter jurisdiction for a suit arising out of a controversy between the parties, to seek an order compelling arbitration. 9 U.S.C. § 4.

The FAA reflects a strong federal policy in favor of compelling arbitration. The Supreme Court has advanced this policy by guarding against unwarranted judicial interference with arbitration agreements. See e.g., Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019) (holding that courts cannot decide issues that the parties agreed to submit to arbitration "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless"); Prima Paint, 87 S. Ct. at 1807 (holding that arbitrators have the primary power to decide legal issues relating to the parties' contract absent evidence indicating the parties intended to exclude those issues from arbitration). The Supreme Court has also held that under the FAA, "an arbitration provision is severable from the remainder of the contract." Rent-A-Center, 130 S. Ct. at 2778 (quoting Buckeye Check Cashing, Inc. v. Cardegna, 126 S. Ct. 1204, 1209 (2006)). In other words, "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." Id.

**B.    Standard of Review**

When analyzing a motion to compel arbitration courts follow a two-step process. See OPE International LP v. Chet Morrison Contractors, Inc., 258 F.3d 443, 445 (5th Cir. 2001) (per curiam) (citing Webb v. Investacorp, Inc., 89 F.3d 252, 257-58 (5th Cir. 1996) (per curiam) (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 105 S. Ct. 3346, 3355 (1985))).  The first step is to determine whether the parties agreed to arbitrate their dispute.  Id.  The second step is to determine "whether legal constraints external to the parties' agreement foreclose[] the arbitration of those claims." Id. at 446 (citing Webb, 89 F.3d at 258).  Because neither party contends that legal constraints foreclose arbitration of CMA's claims, the court's analysis is restricted to the first step of the analysis.

The first step of the court's analysis involves two questions: (1) whether there is a valid arbitration agreement, and, if so, (2) whether the claims at issue fall within the scope of that agreement.  OPE International, 258 F.3d at 445.  Ordinarily principles of state law governing the formation of contracts determine whether there is a valid agreement to arbitrate, id. at 445-46, but when a dispute concerns a maritime contract, federal admiralty law determines whether there is a valid agreement to arbitrate. See Barrios v. Centaur L.L.C., 121 F.4th 515, 518 (5th Cir. 2024) (per curiam) (citing Har-Win, Inc. v. Consolidated Grain & Barge Co., 794 F.3d 985, 987 (5th Cir. 1986)).  When "determining

13

the scope of a valid arbitration agreement, [courts] apply the
federal policy and resolve ambiguities in favor of arbitration."
Klein v. Nabors Drilling USA L.P., 710 F.3d 234, 237 (5th Cir.
2013). "As a contract interpretation issue, a court can only
determine arbitrability by looking to the arbitration clause
itself." Halliburton Energy Services, Inc. v. Ironshore Specialty
Insurance Co., 921 F.3d 522, 531 (5th Cir. 2019). If the court
finds that a valid agreement to arbitrate exists and that the
claims asserted fall within the scope of that agreement, the court
is required to compel arbitration. Id. If, however, the court
finds that there is no arbitration agreement between the parties,
or that no dispute falls within the scope of a valid arbitration
agreement, the court must deny the motion to compel arbitration
with prejudice. Id. at 531-32.

In ruling on a motion to compel arbitration, the court may
consider evidence outside the pleadings. See Gezu v. Charter
Communications, 17 F. 4th 547, 552-54 (5th Cir. 2021) (relying on
declarations as evidence that the parties had formed an agreement
to arbitrate). The moving party bears the burden of "prov[ing] the
existence of an agreement to arbitrate by a preponderance of the
evidence." Grant v. Houser, 469 F. App'x 310, 315 (5th Cir. 2012)
(per curiam). If the moving party carries its burden of proving
the existence of an agreement to arbitrate, the burden "shifts to
the party opposing arbitration to demonstrate either that the
agreement is invalid or, at a minimum, to allege the dispute is

14

outside of the agreement's scope." Id. (citing <u>Carter v.</u>
<u>Countrywide Credit Industries, Inc.</u>, 362 F.3d 294, 297 (5th Cir.
2004)). The court's "sole responsibility is to determine whether
this dispute is governed by an arbitration [agreement], not to
determine the merits of the dispute." <u>Pennzoil Exploration &</u>
<u>Production Co. v. Ramco Energy Ltd.</u>, 139 F.3d 1061, 1067 (5th Cir.
1998). A district court should not order arbitration unless it is
"satisfied that the making of the agreement for arbitration . . .
is not in issue." 9 U.S.C. § 4.

## III. <u>Analysis</u>

Citing the Governing Law and Jurisdiction provision in the
parties' Letter Agreement, GCC argues that "the BIMCO Bunker Terms
2018 — 'sets out the terms of a legally binding agreement' between
the parties, and mandates that '[a]ny dispute arising out of or in
connection with the Contract shall be referred to three (3) persons
at New York [SMA Arbitration].'"[32] Asserting that CMA's "claims in
this action arise out of or in connection with purchase and sale of
marine fuel by and between CMA CGM and GCC under the BIMCO Bunker
Terms 2018, such that the claims are covered by the parties'
agreement to arbitrate,"[33] GCC argues that the Court should compel
arbitration.

---

[32]<u>Id.</u> at 1 & n. 4 (citing Letter Agreement, Docket Entry
No. 11-2, p. 2 ¶ 6, and BIMCO Bunker Terms 2018 as amended, p. 1,
Docket Entry No. 11-2, p. 3).

[33]<u>Id.</u> at 13.

CMA argues that the court should deny GCC's motion to compel because "[t]he relevant deliveries were expressly made under the GCC Terms and Conditions and GCC did not agree to the BIMCO terms until months after the deliveries were completed."[34] Asserting that "under Texas law, the limitation periods set out in the GCC Terms and Conditions are unenforceable," CMA argues that the court should deny CMA's motion and "require GCC to answer the Complaint."[35]

## A.   Undisputed Evidence Establishes that CMA and GCC are Parties to a Valid Arbitration Agreement

CMA does not dispute that the parties' Letter Agreement contains a choice-of-law and arbitration provision titled "Governing Law and Jurisdiction," which states that "as set forth in the Bunker Terms 2018, U.S. General Maritime Law/New York law, New York SMA [Society of Maritime Arbitrators] arbitration."[36]  Nor does CMA dispute that the BIMCO Bunker Terms 2018 includes a Dispute Resolution Clause stating that

---

[34]Plaintiff's Response in Opposition, Docket Entry No. 13, p. 1. See also id. at 5 ("GCC filed its Motion to Compel on April 30, 2025, asking the Court to enforce an arbitration provision that was contained in a contract that did not govern, and was entered after the consummation of the relevant transactions."), and 7 ("CMA CGM argues in response that the GCC's terms apply over BIMCO 2018, defeating the motion under Rules 12(b)(1) and 12(b)(3).").

[35]Id.  See also id. at 7 ("[T]he putative limitation on the time within which CMA CGM can submit a claim regarding quality of the bunkers is unenforceable under Texas law, defeating the 12(b)(6) motion.").

[36]Letter Agreement, Docket Entry No. 11-2, p. 2 ¶ 6.

> [a]ny dispute arising out of or in connection with the
> Contract shall be referred to three (3) persons at New
> York, one to be appointed by each of the parties hereto,
> and the third by the two so chosen. . . The proceedings
> shall be conducted in accordance with the SMA Rules
> current as of the date of the Contract.[37]

The court concludes therefore that undisputed evidence establishes
that CMA and GCC are parties to a valid arbitration agreement.

**B.   CMA's claims Fall within the Scope of the Parties' Valid
Arbitration Agreement**

CMA argues that the parties' valid arbitration agreement
formed by the Letter Agreement, which incorporates by reference the
BIMCO Bunker Terms 2018, does not govern the claims asserted in
this action because that agreement was "entered after the
consummation of the relevant transactions."[38]   CMA argues that

> [e]ach sale and delivery was governed by the Sales Order
> Confirmations, which were offered by GCC and accepted by
> CMA CGM through its acceptance of the bunkers.  The Sales
> Order Confirmations incorporated the GCC Terms, which
> "constitute[d] the entire understanding between the
> parties and **supersede[d] all prior oral or written
> agreements, representations, or warranties.**" (Emphasis
> added). . .  Thus, any negotiations occurring prior to
> the parties' performance under the Sales Order
> Confirmations, including the Contract Confirmations and
> the unexecuted Letter Agreement, were superseded by the
> Sales Order Confirmations.  The BIMCO 2018 terms were not
> agreed or accepted by GCC, if at all, until June 28,
> 2023, and therefore did not govern transactions completed
> prior to that date which were made expressly pursuant to
> the GCC Terms. . .  Thus, the terms of the Sales Order
> Confirmations, which incorporated the GCC Terms, governed
> the sale and delivery of the bunker fuels.  As the GCC

---

[37]BIMCO Bunker Terms 2018 as amended, § 24(b), Docket Entry
No. 11-2, p. 14.

[38]Plaintiff's Response in Opposition, Docket Entry No. 13,
p. 5.

> Terms provide for exclusive venue in the federal court in
> Harris County, Texas and make no mention of arbitration,
> there is no agreement to arbitrate that could support
> GCC's argument.[39]

In other words CMA argues that the transactions at issue are not
governed by the parties' BIMCO Bunker Terms 2018 contract because
"GCC's Sales Order Confirmation[s] included terms different from
the Contract Confirmation[s], namely the application of the GCC
Terms to the transaction rather than BIMCO 2018."[40]  Citing the
Texas version of the Uniform Commercial Code ("UCC"), CMA argues
that the new terms provided by the Sales Order Confirmations

> do not serve as a rejection and counteroffer but should
> "be construed as proposals for addition to the [Contract
> Confirmations]." See Tex. Bus. & Com. Code § 2.207(b).
> By its vessels' acceptance of the bunker deliveries, CMA
> CGM accepted the new terms set out in the Sales Order
> Confirmation[s].[41]

The claims that CMA has asserted in this action are for breach
of a maritime contract arising from the manufacture, sale, and
supply of marine fuel to CMA for consumption by vessels owned or
operated by CMA.[42]  Although CMA asserts that this matter is subject
to Texas law,[43] when a dispute concerns a maritime contract, federal

---

[39]Id. at 9.

[40]Id. at 12.

[41]Id.

[42]Complaint, Docket Entry No. 1, p. 1 ¶ 3.  See also id. at 3-6
¶¶ 14-39 (asserting claims for breach of contract, breach of
warranties, negligence, and product liability).

[43]Plaintiff's Response in Opposition, Docket Entry No. 13,
p. 1.

admiralty law determines whether there is a valid contract.[44]  <u>See</u>
<u>Barrios</u>, 121 F.4th at 518.  Moreover, both the contract that GCC
contends applies (<u>i.e.</u>, the Letter Agreement incorporating the
BIMCO Bunker Terms 2018), and the contract that CMA contends
applies (<u>i.e.</u>, the GCC Terms), call for application of United
States General Maritime Law.[45]  The elements of contract formation
under general maritime law are (1) an offer, (2) acceptance, and
(3) consideration.  <u>In re Tasch, Inc.</u>, 46 F. App'x 731, 2002 WL
1973464, at *3 (5th Cir. 2002) (per curiam).  An offer is "a
manifestation of intention to act or refrain from acting in a
specified way, so made as to justify a promisee in understanding
that a commitment has been made."  Restatement (Second) of
Contracts § 2(1)(1981).  "Acceptance of an offer is a manifestation
of assent to the terms" offered.  <u>Id.</u> at § 50(1).  A "performance
which is bargained for is consideration."  <u>Id.</u> at § 72.

    The undisputed evidence shows that by January of 2022 the
parties had reached an agreement on "pretty much everything" in

---

[44]Typically, ordinary principles of state contract law
determine whether there is a valid agreement to arbitrate.
<u>Halliburton Energy Services, Inc. v. Ironshore Specialty Insurance</u>
<u>Co.</u>, 921 F.3d 522, 530 (5th Cir. 2019).  Neither party has briefed
any choice-of-law issue.  The court's conclusions as to the
validity of the arbitration agreement would not change if Texas law
applied instead of maritime law.

[45]<u>See</u> Letter Agreement, Docket Entry No. 11-2, p. 1 ¶ 1(a)
(incorporating the terms and conditions attached in Annex 1 of this
letter ("Amended BIMCO Bunker Terms 2018"); BIMCO Bunker Terms 2018
as amended, § 24(b), Docket Entry No. 11-2, p. 14; GCC Terms,
Docket Entry No. 13-3, p. 21 ¶ 18.1.

their BIMCO Bunker Terms 2018 contract such that only three items remained open: de-bunkering, liability, and arbitration.[46]   On February 6, 2023, CMA's Galliano sent GCC's Ray an email with a draft Letter Agreement that included in ¶ 6 choice of law and forum selection provisions establishing that any dispute or claims arising out of or in connection with the parties' agreement would be governed by the law of England and Wales.[47]   On February 10, 2023, Ray sent Galliano an email seeking to replace the choice of law and forum selection provisions in ¶ 6 of the draft Letter Agreement with the following arbitration provision: "**GOVERNING LAW AND JURISDICTION** — as set forth in the Bunker Terms 2018, U.S. General Maritime Law/New York law, New York SMA [Society of Maritime Arbitrators] arbitration."[48]   On March 8, 2023, Galliano responded to Ray: "Having reviewed this internally and point 6 amended is accepted on letter."[49]   Because under the FAA, "an arbitration provision is severable from the remainder of the contract," Rent-a-Center, 130 S. Ct. at 2778, the court concludes that the parties' email exchange of February 6, 2023, to March 8,

---

[46]Email Chain, Docket Entry No. 11-4, p. 13; Docket Entry No. 11-5, p. 16.

[47]Id., Docket Entry No. 11-4, p. 6; Docket Entry No. 11-5, p. 8.

[48]Id., Docket Entry No. 11-4, p. 3; Docket Entry No. 11-5, p. 6.

[49]Id., Docket Entry No. 11-4, p. 1; Docket Entry No. 11-5, p. 3.

2023, represents GCC's offer and CMA's acceptance of an arbitration
agreement.  CMA notes that it sent GCC versions of the Letter
Agreement on February 6, 2023, and March 8, 2023, that GCC did not
sign.[50]  But because under maritime law, parties may orally or
informally agree to the main terms of a contract before reducing
those terms to a complete formal writing, see Great Circle Lines,
Ltd. v. Matheson & Co., Ltd., 681 F.2d 121, 124 (2d Cir. 1982), and
because CMA does not argue that the parties required signatures as
a condition of mutual assent, the fact that CMA did not send GCC a
complete formal writing of their agreement until June 2, 2023, and
that GCC did not sign that writing until June 28, 2023, does mean
that the arbitration agreement was not valid until signed.

The Contract Confirmations that CMA sent to GCC on March 23,
2023 (Contract Confirmations 4192, 4194, 4196), which provided
terms for delivery of bunkers in April, May, and June of 2023,
respectively, identified the parties, payment terms, and
warranties, and incorporated the arbitration agreement by including
the following language: "+Terms: the one we are currently
finalizing would apply to this tender." Because the March 3, 2023,
Sales Order Confirmation that GCC sent to CMA shows that GCC was to
make the first delivery of bunker fuel to CMA on March 16, 2023,[51]

---

[50]Plaintiff's Response in Opposition, Docket Entry No. 13,
p. 13 n. 1.

[51]See March 3, 2023, Sales Order Confirmation, Docket Entry
No. 13-1, p. 2.

<u>i.e.</u>, over a week after CMA assented to the arbitration agreement,[52] and because CMA acknowledges that the Sales Order Confirmations transmitted from GCC to CMA between March 3, 2023, and June 14, 2023, covered deliveries from March 16, 2023, to June 21, 2023,[53] undisputed evidence shows that the parties' formed a valid arbitration agreement before consummating the transactions at issue, and that consummation of those transactions served as consideration for <u>inter alia</u> the arbitration agreement.

CMA's argument that each sale and delivery at issue in this action was not governed by the parties' valid arbitration agreement, but was instead governed by GCC's Terms because GCC sent CMA Sales Order Confirmations that incorporated the GCC Terms by reference and that CMA agreed to the GCC Terms by accepting the deliveries is unpersuasive for at least two reasons.

1.   <u>The Texas Version of the UCC Would Not Allow the GCC Terms to be Added to the Parties' Agreement</u>

In support of its argument that the transactions at issue are governed by the GCC Terms instead of the Letter Agreement and the BIMCO Bunker Terms 2018, CMA cites Tex. Bus. & Com. Code § 2.207(a) for stating that

---

[52]Email Chain, Docket Entry No. 11-4, p. 1, Docket Entry No. 11-5, p. 3.

[53]Plaintiff's Response in Opposition, Docket Entry No. 13, pp. 5 and 12-13.

> [a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms,

and § 2.207 (b) for stating that "[t]he additional terms are to be construed as proposals for addition to the contract."[54]  CMA argues that pursuant to § 2.207(b), the GCC Terms were added to the parties' agreement.[55]  CMA's argument rests on the first sentence of § 2.207(b) but fails to cite the second sentence, which states that

> such terms become part of the contract unless:
>
> (1)   the offer expressly limits acceptance of the offer;
>
> (2)   they materially alter it; or
>
> (3)   notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Tex. Bus. & Com. Code § 2.207(b).  Assuming without deciding that Tex. Bus. & Com. Code § 2.207 applies to the contract formation at issue, CMA's reliance on that section is misplaced because the terms that CMA contends were added would materially alter the parties' agreement by negating the arbitration agreement reached on March 8, 2023, and replacing it with a new forum selection provision.  See Cunningham v. Fleetwood Homes of Georgia, Inc., 253

---

[54]Id. at 11 (quoting Tex. Bus. & Com. Code § 2.207).

[55]Id. at 12-14.

F.3d 611, 621 n. 12 (11th Cir. 2001) (noting that forum selection provisions are generally considered material terms under state law variants of the UCC). See also J.D. Fields, Inc. v. Independent Enterprises, Inc., No. 4:12-cv-2605, 2012 WL 5818229, at *7 (S.D. Tex. November 13, 2012) ("Forum selection clauses are typically considered material and therefore require express assent to become binding."). Because the GCC Terms that CMA argues were added to the parties' agreement by CMA's acceptance of fuel deliveries pursuant to GCC's Sales Order Confirmations would materially alter the parties' agreement, § 2.207(b)(2) would not allow those terms to be added to the parties' agreement. Cases that have found similar provisions not to be material, involved parties who had either signed an agreement with a similar provision, or whose previous course of dealings involved such a provision. See Oceanconnect.com, Inc. v. Chemoil Corp., No. H-07-1053, 2008 WL 194360, at *3 (S.D. Tex. January 23, 2008)(citing Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 446-48 (3rd Cir. 2003) (no material alternation when prior course of dealing was consistent)). CMA fails to cite any evidence showing that the parties had signed an agreement with either a choice of law or a forum selection provision like those included in the GCC Terms, or that the parties' previous course of dealings was subject to such provisions.

24

2.  The Letter Agreement Incorporating the BIMCO Bunker Terms
    2018 Contract Constitutes the Parties' Entire Agreement

CMA's Response in Opposition to GCC's Motion to Compel

acknowledges that

> [i]n December 2022 and March 2023, [it] sent
> correspondence to GCC that set out the terms of [its]
> requirements contracts with GCC for delivery of bunker
> fuels (the "Contract Confirmations").  From March to June
> 2023, GCC sold and delivered bunker fuels to twelve (12)
> different CMA CGM vessels. . . Each sale and delivery was
> made pursuant to a Sales Order Confirmation governing the
> deliveries to each vessel ("Sales Order Confirmation").
> . . . The Sales Order Confirmations were transmitted from
> GCC to CMA CGM between March 3, 2023 and June 14, 2023,
> covering deliveries from March 16, 2023 to June 21,
> 2023.[56]

The Contract Confirmations that CMA sent to GCC all identified the

parties, payment terms, and warranties, and acknowledged

application of the parties' arbitration agreement by including the

following language: "+Terms: the one we are currently finalizing

would apply to this tender."  As evidenced by emails exchanged

between Galliano and Ray from March 17, 2023, to March 23, 2013,

regarding "HOUSTON - TENDER April 2023,"[57] the agreement that the

parties were then currently finalizing is the Letter Agreement,

which states that the BIMCO Bunker Terms 2018 "shall apply to any

contract for the sale of marine fuel by the Seller or the Seller's

---

[56]Id. at 5.

[57]Houston Tender Emails, Exhibit N to Defendant's Motion to
Compel, Docket Entry No. 11-15, pp. 1-5.

Affiliates to the Buyer or the Buyer's Affiliates . . . and be the sole set of terms and conditions that apply to such Contract."[58]

> On March 17, 2013, Galliano wrote to Ray:
>
> For the terms [I] see you indicated "I have adjusted the terms to reflect our last bimco," and indicated in your document "Contract terms: GCC Last proposed Bimco adjusted terms . . . sent 2/10/2023. Bunker Terms 2018, U.S. General Maritime Law/New York law, New York SMA arbitration."
>
> For me it is the one we are currently trying to finalize waiting for your info based on yellow part for letter.
>
> Please confirm we are on same page for that and if something is finalized soon (which should be the case now!) it will be applied to tender in discussions if we come to an agreement?[59]

Later the same day, Ray responded, "Correct the one we are currently finalizing and would apply to this tender."[60] Galliano reiterated CMA's agreement that the BIMCO Bunker Terms 2018 would apply to the parties' on-going transactions in emails that she sent to Ray on March 22 and 23, 2023, by stating, "Terms: the one we are currently finalizing would apply to this tender when all clarified."[61]

The email exchanges between Galliano and Ray in February and March of 2023 coupled with the parties' on-going practice of buying

---

[58]Letter Agreement, Docket Entry No. 11-2, p. 1 ¶ 1(a).

[59]Houston Tender Emails, Docket Entry No. 11-15, p. 4-5.

[60]Id. at 4.

[61]Id. at 1-3.

and selling marine fuel oil pursuant to the terms stated in the email exchanges, evidence a meeting of the minds ultimately recorded in the Letter Agreement, which states that the BIMCO Bunker Terms 2018 "shall apply to any contract for the sale of marine fuel by the Seller or the Seller's Affiliates to the Buyer or the Buyer's Affiliates . . . and be the sole set of terms and conditions that apply to such Contract."[62]   Moreover, the Letter Agreement also states that

> b. . . . should any other set of terms and conditions appear on, or be referred to in, any of the Seller's or its Affiliates' confirmation notes or any other communications issued by the Seller or its Affiliates in relation to any marine fuel, which is sold by the Seller or its Affiliates to the Buyer or the Buyer's Affiliates, then such set of terms and conditions shall not be incorporated in any Contract; and

> c.  if any term appears on, or is referred to in, any of the Seller's or its Affiliates' confirmation notes or any other communications issued by the Seller or its Affiliates in relation to any Contract, which conflicts with the Bunker Terms 2018, then the Bunker Terms 2018 shall prevail.[63]

The court concludes therefore that the GCC Sales Order Confirmations on which CMA relies in support of the argument that its claims are not subject to arbitration did not supersede the arbitration agreement reached on March 8, 2023, and that the Letter Agreement incorporating the BIMCO Bunker Terms 2018 contract, constitutes the parties' entire agreement.

---

[62]Letter Agreement, Docket Entry No. 11-2, p. 1 ¶ 1(a).

[63]Id. at ¶ 1(b)-(c).

**C.    This Action Will Be Stayed Pending Arbitration.**

Asserting that all of CMA's claims are subject to arbitration, GCC argues that this action should be dismissed, or alternatively, stayed during arbitration.[64]    CMA has not addressed whether this action should be dismissed or stayed pending arbitration.   The FAA instructs courts to stay an action on application of one of the parties if the court determines that the parties have agreed to arbitrate a claim brought before it and the issue is in fact arbitrable.   See 9 U.S.C. § 3.   In Smith, 144 S. Ct. 1178, the Supreme Court held that "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."   Thus, this action will be stayed pending arbitration.

## IV. <u>Conclusions and Order</u>

For the reasons stated above in § III.A, the court concludes that undisputed evidence establishes that the parties formed a valid arbitration agreement, and for the reasons stated above in § III.B, the court concludes that the claims asserted in this action fall within the scope of the parties' valid arbitration agreement.   Therefore, Plaintiff, CMA CGM, S.A., is **ORDERED** to arbitrate with Defendant, GCC Supply & Trading L.L.C., the claims asserted in this action.

---

[64]Defendant's Motion to Compel, Docket Entry No. 11, pp. 17-18.

For the reasons stated above in § III.C, this action is **STAYED**.

Defendant's Motion to Dismiss Plaintiff's claims is **DENIED as MOOT**.

Defendant GCC Supply & Trading LLC's Motion to Compel Arbitration and Dismiss this action or Alternatively Stay These Proceedings, Docket Entry No. 11, is **GRANTED IN PART and DENIED IN PART**.

The parties are **ORDERED** to submit a status report on August 29, 2025, and every sixty (60) days thereafter.

**SIGNED** at Houston, Texas, this 3rd day of July, 2025.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE